[Cite as *State v. Agee*, 2021-Ohio-489.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 19AP-12 |
| v. | : | (C.P.C. No. 16CR-1176) |
| Roshawn L. Agee, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 23, 2021

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Soroka and Associates, LLC, Roger Soroka,* and *Joshua Bedtelyon*, for appellant. **Argued:** *Joshua Bedtelyon.*

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, Roshawn L. Agee, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of two counts of felony murder with associated firearm specifications; guilty, pursuant to bench verdict, of one count of having weapons while under disability; and determining him to be a repeat violent offender. Finding no merit to the appeal, we affirm.

{¶ 2} By indictment filed March 3, 2016, plaintiff-appellee, State of Ohio, charged appellant with two counts of aggravated murder in violation of R.C. 2903.01(A), unspecified felonies, two counts of felony murder in violation of R.C. 2903.02(B),

unspecified felonies, and one count of having weapons while under disability in violation of R.C. 2923.13, a third-degree felony. The aggravated murder and felony murder charges carried three-year firearm specifications in violation of R.C. 2941.145(A), repeat violent offender specifications in violation of R.C. 2941.149(A), and criminal gang activity specifications in violation of R.C. 2941.142(A). The charges arose from the shooting deaths of Robert Bass and Cherod Houchins on July 28, 2014.[1]

{¶ 3} Appellant waived his right to a jury trial and elected to be tried by the court on the having weapons while under disability count. The aggravated murder and felony murder counts, along with the firearm and gang specifications, were tried to a jury. Appellant was tried jointly with co-defendant Sophia Childs.[2] The evidence presented at trial relevant to this appeal establishes the following.

{¶ 4} In July 2014, four drug "trap" houses operated in the Stevens Avenue/Schultz Avenue area on the near west side Columbus. Because the drug trade in the area was quite profitable, there was significant competition among the trap houses. In addition, due to the illegal and lucrative nature of the drug business, those operating the trap houses had armed security at the doors; only persons known to security were permitted to enter and purchase drugs.

{¶ 5} The two trap houses central to the present case were located within two blocks of each other on Stevens Avenue. The trap house located at 189-R Stevens Avenue ("189-R Stevens") was operated by appellant and Childs, also known as "Fee." In addition to their drug trafficking operation, Childs and appellant were in a personal relationship. It is undisputed that at the time of the events at issue, appellant was imprisoned at Noble Correctional Institution. Childs' associate, Clarence Pierce, also known as "Chicago," sometimes acted as security for the trap house. (Tr. at 459-60.) The second trap house, located at 85 Stevens Avenue ("85 Stevens"), was rented by Calvin Clark and operated by Dwayne Lewis, also known as "D," and Robert Earl Wilson, also known as "Boo Face." Clark, D, and Boo Face are all bald, African American men.

---

[1] Appellant's first trial, conducted in January 2018, resulted in a hung jury on the aggravated murder and felony murder charges.

[2] Childs was indicted for two counts of aggravated murder, two counts of felony murder, and one count of having weapons while under disability. The aggravated murder and felony murder counts included firearm specifications.

{¶ 6}    On July 26, 2014, Catherine Dudley ("Dudley"), an admitted long-time drug user, was at 85 Stevens purchasing drugs from D.  Childs entered the house and began arguing with D about drug sales.  At one point, Childs said she "didn't give a fuck" and would "shut this motherfucker down and shoot up * * * this house."  *Id.* at 473.  Dudley returned to 85 Stevens the next day and saw that the front window was broken and a brick was sitting on the living room floor.

{¶ 7}    On July 28, 2014, Dudley spent the entire day using drugs at both 189-R Stevens and 85 Stevens.  At approximately 9:00 p.m., she walked from 189-R Stevens to 85 Stevens.  A person inside the house opened the back door for her; she had "no idea" who did so.  *Id.* at 607.  Bass and Houchins were in the kitchen.  Dudley requested drugs from Bass, but before he could provide them, two men, both carrying guns, entered the kitchen through the back door.  Dudley did not know the men, did not open the door for them, did not see anyone else open the door for them, and did not think the men forced their way inside.   One of the men wore a red shirt and immediately shot Bass in the head; the other attempted to fire his gun but it jammed.  Dudley exited through the back door and ran toward 189-R Stevens.  She heard multiple gunshots as she ran away.

{¶ 8}    Dudley knocked on the door at 189-R Stevens; no one answered.  She then walked down the alley behind 189-R Stevens to a nearby garage and told the two men sitting inside that she had just witnessed Bass get shot.  Approximately 20 minutes after the shooting, she saw Childs driving an SUV toward 189-R Stevens.  Childs parked behind 189-R Stevens and exited the vehicle along with the man in the red shirt Dudley had seen shoot Bass. Shortly thereafter, Childs and the man carried several items from 189-R Stevens and loaded them into the SUV.

{¶ 9}    Dudley was arrested the next day on an outstanding misdemeanor warrant.  She agreed to tell the police what she had seen at the two Stevens Avenue trap houses on July 28, 2014 in exchange for lifting the warrant.  She did not tell the police that she had witnessed an argument between Childs and D on July 26, 2014 because she did not think it was related to the shooting.  She did, however, tell the police that she thought "Chicago and them * * * robbed the guys."  *Id.* at 604.  At trial, she explained that by "Chicago and them" she meant Chicago and Childs; however, she conceded that she did not identify Childs by name when questioned by the police.  She further admitted that she did not see either

Chicago or Childs at 85 Stevens at the time of the murders. On August 1, 2014, the police showed Dudley photo arrays of possible suspects. She identified the man who had shot Bass and the man whose gun had jammed. She told the police she did not know their names.

{¶ 10} On July 28, 2014, LaToya Galloway ("Galloway"), an admitted long-time drug user with a lengthy criminal record, was using drugs at 189-R Stevens and overheard Childs speaking on the phone to a person Galloway assumed was appellant. During the call, Childs said "Okay. Okay. I'm going to shut the damn spot down." *Id.* at 843. Childs then left in an SUV. Approximately 30 minutes later, Galloway heard gunshots outside. Childs returned to 189-R Stevens five to six minutes after the shots were fired. Galloway observed a "young dude" wearing a "red hoodie" with Childs. *Id.* at 847. Galloway described the man as "paranoid. He was sweating a lot, walking around, peeking out the window." *Id.* at 848. Childs and Galloway left 189-R Stevens for a brief time. When they returned, the man in the red hoodie was still inside. Shortly thereafter, the three of them left in Childs' SUV. During the drive, Childs and the man engaged in a heated conversation during which Childs said, "You're stupid. I told you the bald-headed mother - - you just shot the wrong motherfuckers. I told you to shoot the bald-headed dude. * * * You didn't kill the right person." *Id.* at 855-56. After Childs dropped the man off, she and Galloway returned to 189-R Stevens.

{¶ 11} The next day, Galloway confronted Childs about the shooting at 85 Stevens. Galloway was angry at Childs because two "innocent kids" had been killed. Childs responded, "I don't give a fuck. They shot the wrong person." *Id.* at 858.

{¶ 12} Galloway did not contact the police after the murders because she did not feel it was her business to do so. She first spoke to the police in July 2017 as a favor to Boo Face (with whom she had a sexual relationship) regarding his involvement in a completely separate criminal incident. She was unaware that she would be asked about the July 28, 2014 incident until the police began questioning her about it. She agreed to provide information only if she would not be required to testify in court, as she did not want to be labeled "a snitch" and was concerned about "retaliation" for testifying. *Id.* at 821, 823. She was subpoenaed to testify, however, and did so, albeit unwillingly.

{¶ 13} On cross-examination, Galloway was impeached by testimony she provided in appellant's first trial, i.e., that Childs did not return to 189-R Stevens for 30 to 45 minutes

after the shots were fired. She also acknowledged her testimony in the first trial that she told the police that she was at 85 Stevens during the shooting, that two "young dudes" opened the door because they were "thirsty for money," and that the shooters began shooting before they entered the house. She explained that she told police that "story" because it was what she had heard "on the street." *Id.* at 892-93.

{¶ 14} Teresa Bass ("Ms. Bass"), an admitted long-time drug user, frequently purchased and used drugs at 85 Stevens and was aware that Childs sold drugs on Stevens Avenue. Late in the afternoon on July 28, 2014, she was with Calvin and others at 85 Stevens. She heard and observed Childs arguing with Calvin by the back door. An African American man was with Childs. Childs told Calvin that "if she wanted to, she could shut this house down, * * * and that she could shoot it up." *Id.* at 915.

{¶ 15} A few hours later, Ms. Bass saw Bass and Houchins in the kitchen of 85 Stevens acting as security and controlling drug sales. She and Calvin went into the bedroom. Dudley entered the bedroom to retrieve a scale Bass needed to measure drugs. After Dudley left, Ms. Bass heard gunshots coming from the kitchen. She and Calvin entered the kitchen and saw Bass and Houchins on the floor; both had sustained gunshot wounds. Dudley was not in the kitchen. Ms. Bass later provided a statement to the police reporting what she had heard Childs say to Calvin. She acknowledged she was not completely honest with the police because she was afraid of repercussions for her family. She further acknowledged that a warrant issued for her arrest in a prior, unrelated misdemeanor drug case had been lifted in exchange for her trial testimony; however, this circumstance did not influence her testimony.

{¶ 16} Tina Legg ("Legg"), an admitted long-time drug user with a lengthy criminal record, regularly purchased drugs from the trap houses on Stevens Avenue. On July 26, 2014, Legg witnessed a confrontation between Childs, Calvin, and D pertaining to the men's refusal to allow Childs to sell drugs out of 85 Stevens. Childs was "pissed off, mad, [and] angry" about the situation. *Id.* at 1123. Late in the evening on July 28, 2014, Legg and Chicago were standing at an intersection near a lighted parking lot on West Broad Street not far from Stevens Avenue. Childs, driving a dark SUV, stopped and asked Chicago if he was "ready to go shoot the house up and take over the block," which Legg interpreted to mean taking over the drug trade at 85 Stevens by force. *Id.* at 1129. Legg did not know if

anyone else was in the SUV.  Thereafter, Childs drove away; Chicago remained with Legg. Five to ten minutes later, Legg saw several emergency vehicles drive toward Stevens Avenue.  She then observed Childs' SUV drive past where she was standing; she could not see who was inside the vehicle.

{¶ 17} Columbus Police Officer Thomas Pierson was dispatched to 85 Stevens at 9:21 p.m. on July 28, 2014. According to Pierson, the radio dispatch indicated that two men had been shot and that two potential suspects, both African American males, one wearing tan pants, had been seen running northbound from the scene.  Upon arrival, a man named Calvin let Pierson inside the house.  Pierson observed two men with gunshot wounds on the kitchen floor.  One of the men was positioned very near the closed back door; the other was slumped against a wall.  Pierson saw no signs of forced entry through the back door.

{¶ 18} Columbus Police Detective Suzanne Nissley of the Crime Scene Search Unit ("CSSU") responded to 85 Stevens after the murders.  There were no signs of forced entry into the house and there was no evidence of a burglary or robbery.  No DNA or fingerprint evidence was collected.

{¶ 19} Columbus Police Detective Timothy Huston works in the Central Intelligence Unit ("CIU"), also known as the "gang unit."  *Id.* at 1051.  Pursuant to his investigation following the murders on July 28, 2014, Huston developed two suspects–Antonio Rogers, also known as "Mook," and Dionte Agee, also known as "D Money."  *Id.* at 1059.  D Money was appellant's brother; Mook was a known associate of appellant and was part of the drug operation appellant ran on the west side of Columbus.  On July 31, 2014, three days after the 85 Stevens murders, D Money and his girlfriend were fatally shot.  Huston, aware that appellant was in prison and based on a belief that appellant had been apprised of his brother's murder, obtained a subpoena for prison call records made by appellant between July 18 and August 1, 2014.  Pursuant to that subpoena, the prison provided Huston a digital recording of the calls.  At that time, Huston did not consider either appellant or Childs as suspects in the murders.

{¶ 20} Huston assigned a patrol officer, Wesley Williams, to review and create a summary of the calls.  Williams had little training or experience in gang matters and/or trap house operations and was unfamiliar with street and/or gang language.  The summary Williams provided Huston indicated that he overheard a conversation between Childs and

appellant planning the double murder at 85 Stevens. Thereafter, Huston listened to the recorded prison calls and determined that "[i]t sounded like somebody was planning a murder, planning ahead basically, or actually planning to go in there and kill D." *Id.* at 1065. Huston put the calls relevant to the July 28, 2014 murders on a disk and submitted it to the lead detective in the case.

{¶ 21} At the time of the murders, Columbus Police Officer Robert Vass worked in the CIU division.[3] Vass was familiar with the drug trade on Stevens Avenue, including the trap houses at 85 Stevens and 189-R Stevens. Pursuant to his CIU investigations, Vass had numerous encounters with appellant.

{¶ 22} Following the July 28, 2014 murders, Vass reviewed Williams' summary of appellant's prison phone calls. Vass acknowledged that because Williams was not familiar with gang and/or street terminology, the summary he prepared was not completely accurate. In contrast, through his work with CIU, Vass was extremely knowledgeable about gang and drug trafficking matters, including gang and street lexicon. Accordingly, Vass listened to the recordings of the prison calls and corrected Williams' summary in accordance with his more accurate interpretations.[4] Because the recordings were difficult to understand, Vass utilized headphones and listened to the recordings multiple times to determine, to the best of his ability, what was being said. From his previous interactions with appellant, Vass was able to recognize appellant's voice on the recordings. Vass noted that during the calls, appellant sometimes referred to himself as "Skeeno," a nickname he utilized both on the street and on his social media accounts.

{¶ 23} Vass's translation and interpretation of the prison calls establishes the following.[5] At 7:38 p.m. on July 28, 2014, appellant called Childs on her cell phone. Childs reported the argument she had with D at 85 Stevens, which resulted in her later "bust[ing]

---

[3] At the time of trial, Vass was working as a SWAT officer.

[4] Vass identified State's Ex. W12, the summary of the recorded prison calls, and referred to it during his testimony. However, State's Ex. W12 was not offered for admission by the state. *Id.* at 1292 (identified); *Id.* at 1550 (not offered). Vass also identified State's Ex. W13, the transcripts of the recorded prison calls, and referenced them during his testimony. However, the trial court sustained appellant's objection to the admission of State's Ex. W13. *Id.* at 1296 (identified); *Id.* at 1556 (objection sustained). Accordingly, neither State's Ex. W12 nor State's Ex. W13 are part of the appellate record.

[5] State's Ex. B2, the audio recording of appellant's prison calls, was played for the jury during Vass's testimony. State's Ex. B2 was admitted into evidence and is part of the appellate record.

out" a window. *Id.* at 1302. Childs told appellant that D nearly assaulted her during the argument. Appellant responded that he "needs to call his dudes[6] real quick." *Id.* at 1303. Appellant further averred that his "little brother" was waiting for him to call so that Childs could "go get him and he can blow over there with you." *Id.* at 1305. Appellant stated that his "little brother" was "Team AB," and he's - - if he's in it for me, he's in it for you." *Id.* at 1308. Vass explained that "AB" was a "gang term" for appellant. *Id.*

{¶ 24} Childs responded, "[Y]eah, I was mad as fuck. He really wanted to hit me and everything * * * though I ain't going to let him * * * get all up in my face." *Id.* at 1306. Childs also reported that Chicago had been afraid to accompany her to Calvin's house because D had stated he was going to "fuck Chicago up." *Id.* at 1310. Childs later said, "Yeah, that was all silent, like that's D's house for real," to which appellant responded, "I would have turned all the way up over there, man." *Id.* at 1311. According to Vass, the phrase "turned up" meant "to get violent, go crazy, tear the place up." *Id.* Childs stated that Calvin was mad at her for breaking the window and that she might have to move if she did not pay for it. Appellant averred that "Chicago should have went over there with you and went on 20." *Id.* at 1313. Vass interpreted this to mean that Chicago should have "go[ne] off big time." *Id.*

{¶ 25} Later in the call, appellant told Childs to call 614-813-1911, ask for "Rob," and tell him "Skeeno [is] on the phone for him." *Id.* at 1314. There were some difficulties with Childs getting Rob on the phone, so appellant had her initiate a three-way call with him. During the three-way call, appellant initially conversed with an unidentified man, who told appellant that he was playing basketball and that "[w]hen I'm done shooting basketball, you know what I'm gonna do? I'm gonna shoot dudes, that's what I do." *Id.* at 1317. Appellant then asked for Rob and was told he was on the east side of the city. Appellant told the man to call Childs and that she would come and get him.

{¶ 26} At 7:56 p.m. on July 28, 2014, appellant called 614-813-1911 and averred to the unidentified man who answered, "I need you and my B to fly out west with my bitch real quick, man." *Id.* at 1319. He continued, "And this is going - - and this is after you do that dude, like, you go right to the next street * * * and get your bag off." According to Vass, "bag off" meant "[g]et a bag of dope." *Id.* at 1320. Appellant then said, "Out west on Stevens, it's a geek, bro." *Id.* at 1321. Vass translated "geek" to mean a drug addict.

---

[6] Vass substituted the term "dude" for racial slurs utilized by appellant.

Appellant continued, "Do shit on Stevens. * * * [W]hen somebody do open the door * * *, it's this bald-headed geek motherfucker. But she gonna let him know * * * that she ain't no tuck her tail in and she ain't about to run to the car or none of that. She's going to be there right with you." *Id.* at 1321-22.

{¶ 27} Appellant then told the man, "if you're in good graces with the queen, then she's going to get you even more dope to sell so you can make more money." *Id.* at 1322. He instructed the man to take his "bang" with him. *Id.* at 1323. Vass testified that "bang" is a street term for a gun. *Id.* Appellant then stated he was going to hang up so he could call Childs and "hook up with you." *Id.* at 1324.

{¶ 28} At 8:06 p.m. on July 28, 2014, appellant called Childs and reported, "My young dude man, he in the car with my other young dude. * * * Rob will be more or less like the muscle * * * after he do what he do." *Id.* at 1325. Childs responded, "Yeah, I don't think D is there, but his son is there." *Id.* at 1326. The two also discussed the fact that Boo Face was not at 85 Stevens. Appellant stated, "I just got off the phone with the young dude * * *. He ridin' around with absolutely nothin' to do * * * and he's out on bond. So I'm like, listen, bro, I need you to * * * do something for me. And he like, oh, shit, bro, I got the strap on me." *Id.* at 1327. According to Vass, "strap" is a street name for a gun. Later in the call, Childs said, "And Calvin, he had to get that done because it's his house," to which appellant responded, "Well, after tonight, it won't be nobody's house." *Id.* at 1328. Childs responded, "[w]ell bro, we need all the money anyway, so fuck them." *Id.*

{¶ 29} Appellant told Childs he wanted Rob to stay with her. "Rob is my motherfucking left hand. * * * You can trust him though, babe, for sure. He ain't nothing like no other dude from around my way * * *. But we about to use these two young dudes. I need you to go get Rob for sure. I need you to call." *Id.* at 1329. Childs responded, "I am, babe. I'm going to get him as soon as I get * * * on the street * * *." *Id.* at 1330. Appellant told Childs to park on Schultz Avenue (one street over from Stevens) and "then walk through the cut," which, according to Vass, meant "between the houses." *Id.* Appellant averred, "[W]e're gonna make all this happen real fast, man, 'cause the motherfucker has got to know that, for every action, there is a reaction * * *." He also told Childs that the man would "have his bang on him." *Id.* at 1331. Appellant told Childs "I'm trying to be in the car with you." *Id.* at 1333. Appellant directed Childs where to pick up the men and then

said, "I ain't about to hang up yet, I want to make sure you all get in the car together." *Id.* Appellant told Childs he would call her later and that she should "[b]e careful." *Id.* at 1334.

{¶ 30} At 10:14 p.m. on July 28, 2014, appellant called Childs and asked her "[w]hat'd you get accomplished?" *Id.* at 1335. She responded that she would see appellant on her next visit. Appellant then asked, "Did they go over there?" *Id.* After some hesitation, Childs responded, "I'll talk to you." *Id.* Appellant then said, "Just say yes or no. That's all you gotta say." *Id.* Childs responded, "No, they did not, no." *Id.* Later during the call, appellant said, "I'm gonna kick D's ass when I get out. Don't worry about it * * *. " *Id.* at 1337. Childs responded, "I don't even want to talk about them." *Id.* Later in the call, Childs said, "I wish you could see the news though." *Id.* at 1340. Appellant stated, "I know. What's on the news? What happened? * * * Somebody get killed?" *Id.* at 1341. Childs replied, "I'll tell you when I visit." *Id.* Appellant then asked "Did somebody get robbed?" *Id.* at 1342. Childs responded, "Babe, no." *Id.*

{¶ 31} Columbus Police Detective James Howe, a digital forensics expert, analyzed phone records associated with Childs' cell phone number, appellant's prison personal identification number, and the 614-813-1911 cell phone number. The 614-813-1911 number was linked to a TracFone wireless company; accordingly, Howe could not determine the identity of the person associated with that number.

{¶ 32} Howe also performed a historical cell-site analysis of Childs' cell phone and the cell phone associated with the 614-813-1911 number. That analysis revealed that both cell phones "pinged" on cell phone towers in the "general location" of 85 Stevens in the hour preceding and following the murders on July 28, 2014. *Id.* at 1453-54.

{¶ 33} On the evidence before it, the jury returned verdicts finding appellant guilty of the felony murder charges with the firearm specifications, but not guilty of the aggravated murder charges and all the gang specifications.[7] The trial court later found appellant guilty of having weapons while under disability[8] and determined appellant to be

---

[7] The jury acquitted Childs of the two aggravated murder counts but was unable to reach a unanimous verdict as to the two felony murder counts. Accordingly, the trial court declared a mistrial as to those counts.

[8] The trial court also found Childs guilty of having weapons under disability.

a repeat violent offender. The trial court sentenced appellant to an aggregate prison term of 27 years to life.

{¶ 34} In a timely appeal, appellant asserts the following two assignments of error for our review:

> [I.] Appellant's conviction was based on insufficient evidence.
>
> [II.] Appellant's conviction was against the manifest weight of the evidence.

{¶ 35} Appellant's first and second assignments of error are interrelated and will be considered together. Appellant contends that his convictions for felony murder and having weapons while under disability were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.

{¶ 36} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, following *Jackson v. Virgina*, 443 U.S. 307 (1979).

{¶ 37} Whether the evidence is legally sufficient to support a criminal conviction is a question of law, not fact. *Thompkins* at 386. "Indeed, in determining the sufficiency of the evidence, an appellate court must give 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *State v. Parks*, 10th Dist. No. 09AP-810, 2010-Ohio-2105, ¶ 7, quoting *Jackson* at 319. "Consequently, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact." *Id.*, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79. "A verdict will not be disturbed unless, after viewing the evidence in the light most favorable to the prosecution,

it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact." *Id.*, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 38} In contrast, a manifest weight of the evidence claim requires a different analysis. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." *State v. Brindley*, 10th Dist. No. 01AP-926, 2002-Ohio-2425, ¶ 35, citing *State v. Gray*, 10th Dist. No. 99AP-666 (Mar. 28, 2000); *State v. Chandler*, 10th Dist. No. 05AP-415, 2006-Ohio-2070, ¶ 8. When presented with a challenge to the manifest weight of the evidence, an appellate court " 'review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1stDist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 39} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis, i.e., a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. Braxton*, 10th Dist. No. 04AP-725, 2005-Ohio-2198, ¶ 15, citing *State v. Roberts*, 9th Dist. No. 96CA006462 (Sept. 17, 1997). "[T]hus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Id.* Accordingly, we must first examine whether appellant's convictions are supported by the manifest weight of the evidence. *State v. Sowell*, 10th Dist. No. 06AP-443, 2008-Ohio-3285, ¶ 89.

{¶ 40} In this case, appellant was prosecuted for felony murder under a theory of complicity. The elements of felony murder are set forth in R.C. 2903.02(B), which states in relevant part that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." The predicate offense of violence charged in the indictment is felonious assault pursuant to R.C. 2903.11. R.C. 2903.11(A)(2) provides in

pertinent part that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon."  A person acts knowingly, regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist.  R.C. 2901.22(B).  It is undisputed that Bass and Houchins suffered fatal gunshot wounds.

{¶ 41} Ohio's complicity statute, R.C. 2923.03, provides in pertinent part that "[n]o person, acting with the kind of culpability required for the commission of the offense, shall * * * [a]id or abet another in committing the offense."  R.C. 2923.03(A)(2).  When an individual acts to aid or abet a principal in the commission of an offense, the individual and principal are equally guilty and the individual is prosecuted and punished as if he were a principal offender.  R.C. 2923.03(F).  The statute further states that "[i]t is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender."  R.C. 2923.03(B).

{¶ 42} To prove complicity by aiding and abetting under R.C. 2923.02(A)(2), the evidence must demonstrate that the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."  *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus.  Such intent may be inferred from the circumstances surrounding the crime.  *Id.*  " '[P]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' "  *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist.1971).  A common purpose among persons to commit a crime need not be shown by positive evidence but may be inferred from circumstances surrounding the act and from the defendant's subsequent conduct.  *State v. Gonzalez*, 10th Dist. No. 10AP-628, 2011-Ohio-1193, ¶ 25, citing *Pruett*.  Further, "[t]he identity of the principal is not an element that the state must prove to establish the offense of complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2)."  *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, paragraph one of the syllabus.

{¶ 43} Moreover, "when a person sets in motion a 'sequence of events, the foreseeable consequences of which were known or should have been known to him at the

time, he is criminally liable for the direct, proximate and inevitable consequences of death resulting from his original act.' " *State v. Hubbard*, 8th Dist. No. 83389, 2004-Ohio-5204, ¶ 40, quoting *State v. Williams*, 67 Ohio App.3d 677, 683 (8th Dist.1990). "It is not necessary that the accused be in a position to foresee the precise consequence of [his] conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by [his] conduct." *Id.*, citing *State v. Losey*, 23 Ohio App.3d 93, 95-96 (10th Dist.1985).

{¶ 44} Here, competent, credible evidence presented at trial permitted a reasonable jury to conclude that appellant was complicit in the murders of Bass and Houchins. Appellant and Childs operated a trap house at 189-R Stevens that was in competition for drug sales with the trap house operated by Calvin, D, and Boo Face at 85 Stevens. Two days before the murders, Childs argued with D about drug sales and threatened to "shoot up" 85 Stevens. During a 7:38 p.m. phone call on the night of the murders, Childs told appellant about the argument with D and averred that he had nearly assaulted her. Appellant indicated that he would have gotten violent with D had he been present. Appellant told Childs that he was going to call an associate and inform him that Childs was going to pick him up and take him to 85 Stevens. Appellant also directed Childs to initiate a three-way call with 614-813-1911; during that call, appellant told the man who answered to call Childs.

{¶ 45} A few minutes later, at 7:56 p.m., appellant called the 614-813-1911 number and told the man who answered that he needed him to accompany Childs and "do shit" on Stevens Avenue. Appellant told the man that at least one of the occupants of 85 Stevens was "bald-headed." As noted above, those involved in operating the trap house at 85 Stevens, i.e., Calvin, D, and Boo Face, were all bald. Appellant directed the individual to bring a firearm with him. Appellant told the man that if he accomplished the task, he would be in Childs' "good graces," who would then provide him more drugs to sell so he could make more money. Appellant then told the man that Childs would get in touch with him.

{¶ 46} Soon after that call ended, appellant called Childs and reported what he had directed the man to do. When Childs mentioned Calvin's house, appellant responded that "after tonight, it won't be nobody's house." Appellant further averred that D had to know

that "for every action, there is a reaction." Appellant also told Childs that the men she was to pick up would have guns on them. He directed Childs where to pick up the men, to park on Schultz Avenue, and to walk to 85 Stevens between the houses. Appellant referred to the men as "Team AB" and averred that they were "in it" for both him and Childs. He told Childs that he "wanted to be in the car" with her and that he did not want to hang up until he was sure she and the men were all in the car together. It is undisputed that the shootings at 85 Stevens occurred within an hour and a half of this phone call, at approximately 9:20 p.m.

{¶ 47} The jury reasonably could conclude that this evidence established that appellant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson*, 93 Ohio St.3d 240 (2001), syllabus. As observed by the state, appellant's statements in the three phone calls preceding the murders indicate that he was angry at those operating the trap house at 85 Stevens and sent his associates there to ensure that those individuals would no longer be selling drugs from that location.

{¶ 48} Indeed, appellant set in motion the sequence of events that led to the deaths of Bass and Houchins. Even if appellant did not specifically direct the men to murder Bass and Houchins, or could not foresee the murders as the precise consequences of his actions, the murders were foreseeable in the sense that what actually transpired was the natural and logical result of appellant's actions in enlisting the men to accompany Childs to the location she had expressed a desire to "shoot up" and directing them to take firearms with them.

{¶ 49} Appellant sets forth several arguments challenging the manifest weight of the evidence underlying his convictions. Appellant first contends that the jury was not required to accept as true the incredible, that is, that he was "somehow able to convince other individuals to murder on his behalf despite being confined to prison with no ability to exert such influence." (Appellant's Brief at 35.) Appellant asserts that the evidence of his communications with the shooters "is devoid of any rationale of why someone may accept this risk on his behalf." There is no offer of profit, physical threats, or any other potential consequences for noncompliance." *Id.* at 36. Appellant's contention is belied by his 7:56 p.m. phone call on July 28, 2014, wherein appellant told his associate that if

he did what he was being asked to do, he would be in Childs' "good graces," resulting in him receiving more drugs to sell. Appellant's statement demonstrates that he was offering his associate something of value in exchange for solving the problem appellant had with those operating the competing trap house at 85 Stevens.

{¶ 50} Appellant also contends that appellant's acquittal on the aggravated murder charges and the gang specifications confirms that appellant was not involved in the murders. We disagree. The jury reasonably could conclude that even if the evidence did not establish beyond a reasonable doubt that appellant "purposely and with prior calculation and design" caused the deaths of the victims pursuant to R.C. 2903.01(A) via criminal gang activity, the evidence established that appellant aided and abetted the principals, whether gang members or simply associates of appellant, in committing felonious assault with a deadly weapon which resulted in the victims' deaths.

{¶ 51} Appellant further argues that his convictions were against the manifest weight of the evidence because the prison phone calls establish that both appellant and Childs knew that neither D nor Boo Face would be present at 85 Stevens. Again, we disagree. The jury reasonably could conclude that appellant aided and abetted the principals in committing felonious assault at 85 Stevens in order to shut down the competition, regardless of whether D and/or Boo Face were present.

{¶ 52} Appellant also challenges as incredible and unreliable the testimony offered by Dudley, Galloway, Ms. Bass, and Legg. Appellant argues that these witnesses lacked credibility and that their testimony was unreliable based upon their history of drug usage and their admitted drug use during the timeframe encompassing the murders. Appellant also contends that their testimony was impeached, internally and externally contradictory, internally inconsistent, or self-serving.

{¶ 53} The jury was well-aware of these witnesses' drug usage, lifestyles, criminal past, and reasons for testifying. Further, the jury heard the testimony appellant now challenges, which, we note, was subject to cross-examination. A decision on the credibility of the witnesses made by a factfinder, such as a jury, is given great deference by a reviewing court. *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 28. The weight to be given the evidence, as well as the credibility of the witnesses, are issues which are primarily to be determined by the trier of fact. *State v. Hairston*, 10th

Dist. No. 05AP-366, 2006-Ohio-1644, ¶ 20, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). The jury is in the best position to take into account inconsistences in witness testimony, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Chandler*, 10th Dist. No. 05AP-415, 2006-Ohio-2070, ¶ 9, citing *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58. A jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Antill*, 176 Ohio St. 61, 67 (1964); *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257. "While the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render [a] defendant's conviction against the manifest weight of the evidence." *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996).

{¶ 54} Appellant also contends that his convictions were against the manifest weight of the evidence because the prosecution failed to prove who committed the murders. Appellant acknowledges that the prosecution was not required to prove the identities of the principals to establish his guilt under a theory of complicity. However, appellant contends that the prosecution relied upon the impermissible stacking of inferences to tie him to the principals.

{¶ 55} "The rule prohibiting the stacking of one inference upon another prohibits the drawing of one inference solely and entirely from another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts." (Citations omitted.) *State v. Ingram*, 10th Dist. No. 11AP-1124, 2012-Ohio-4075, ¶ 23. "Although inferences cannot be built upon inferences, several conclusions may be drawn from the same set of facts." (Citations omitted.) *Id.* "Because reasonable inferences drawn from the evidence are an essential element of the deductive reasoning process by which most successful claims are proven, the rule against stacking inferences must be strictly limited to inferences drawn exclusively from other inferences." (Citations omitted.) *Id.*

{¶ 56} Appellant claims that the jury was required to stack the following three inferences to find him guilty of complicity: (1) that he "ordered, or gave instruction to his co-defendant and unknown assailants to commit the crime of felonious assault or murder,"

(2) that the "unknown shooters acted in complicity with Appellant or under the Appellant's direction, and (3) that he "either aided and abetted the princip[al] offenders." (Appellant's Brief at 19-20.)  These are not three separate inferences stacked upon one another; rather, there is one single inference, phrased by appellant in three different ways.  The single inference, that appellant aided and abetted the principals in committing felony murder, is a conclusion that can be drawn from the evidence presented, particularly the prison calls wherein appellant communicated to the principals that he wanted them to arm themselves and travel to 85 Stevens.

{¶ 57}  Appellant also contends that his liability for murder via a theory of complicity "flowed through Childs['] involvement in the alleged offen[s]e and was directly tied to a theory of complicity with Childs."  *Id.* at 39.  According to appellant, the jury's inability to reach a verdict as to Childs' guilt rendered his conviction against the manifest weight of the evidence.  Indeed, appellant asserts that "Ms. Childs also being found guilty of murder is the only possible way the State's presented theory holds up for certainty that Mr. Agee was guilty of these offenses."  *Id.* at 39-40.  We disagree.  Although the evidence demonstrates that Childs was involved in the events leading to the murders, appellant's liability via complicity was independent from that of Childs.  The evidence demonstrates that appellant spoke directly to at least one of the principals during the 7:38 p.m. call with Childs and then called that person directly at 8:06 p.m., without Childs' involvement.  In both calls, appellant urged the principals to act.  Accordingly, the failure to convict Childs did not, ipso facto, render appellant's conviction against the manifest weight of the evidence.

{¶ 58} Further, even assuming that the verdicts finding appellant guilty and acquitting Childs were inconsistent, inconsistent verdicts between co-defendants does not constitute a sufficient reason for reversing a conviction.  *State v. Hill*, 8th Dist. No. 99819, 2014-Ohio-387, ¶ 33, citing *State v. Eppard*, 6th Dist. No. CL 05-1279, 2007-Ohio-2257, ¶ 16.

{¶ 59}  In light of the evidence presented at trial, we cannot say that the jury clearly lost its way in finding appellant guilty of two counts of felony murder.  We re-emphasize that the weight of the evidence and the credibility of the witnesses are matters primarily for the jury.  *DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.  The jury heard the testimony provided by the witnesses familiar with what transpired both in the days

preceding the murders and at the actual time of the murders. The jury also heard the audio recordings of the prison calls, along with Vass's translations and interpretations of those calls. Following evaluation of this evidence, the jury reasonably could conclude that appellant aided or abetted the actions of the individuals who fired deadly weapons inside the 85 Stevens trap house, and that such actions caused the deaths of Bass and Houchins. Accordingly, we conclude that appellant's felony murder convictions are not against the manifest weight of the evidence.

{¶ 60} We now consider appellant's manifest weight/sufficiency arguments regarding his conviction for having weapons under disability. R.C. 2923.13(A)(2) provides, in relevant part, that "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm * * * if * * * [t]he person * * * has been convicted of any felony offense of violence." The parties stipulated that appellant had a previous disqualifying conviction. A stipulation that a defendant has a prior felony offense of violence conviction "relieve[s] the state of its burden of proving the prior conviction element of the weapons-under-disability charge." *State v. McLaughlin*, 12th Dist. No. CA2019-02-002, 2020-Ohio-969, ¶ 56.

{¶ 61} In finding appellant guilty of having weapons under disability, the trial court stated:

> I find * * * each defendant guilty of * * * having weapons under disability. I believe the evidence indicated beyond a reasonable doubt that they both were involved in the conspiracy to commit murder and that the co-conspirators who carried out the homicides were armed with firearms.
>
> And based on the case law that the State provided the Court about three or four weeks ago, the defendants can be guilty of weapons under disability based on their own disabilities, plus the possession of the firearm by other principal offenders. Even though we don't know who they are, we know a firearm was used. And, as I said, I believe beyond a reasonable doubt that they conspired with the people who used the firearms. So the finding is guilty on the weapons under disability for both of them.

(Tr. at 1874-75.)

{¶ 62} Appellant first contends that R.C. 2923.01, the conspiracy statute, "does not allow the prosecution of a Weapons Under Disability charge or a Felonious Assault charge through a theory of conspiracy." (Appellant's Brief at 29.) Appellant's conspiracy argument is misplaced. As with the felony murder prosecution, appellant was prosecuted for having weapons under disability under a theory of complicity, not conspiracy. Although the trial court, after finding appellant guilty, referenced a "conspiracy," the sentencing entry clearly states that appellant was found guilty of having weapons while under disability in violation of R.C. 2923.13, not conspiracy in violation of R.C. 2923.01. A court speaks through its journal and not mere oral pronouncements. *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, ¶ 15.

{¶ 63} Appellant further contends that the evidence fails to support the trial court's finding of guilt because "[t]here was no testimony offered that Appellant ever possessed a gun on the date in question, or even that he had constructive possession of any firearm on the date in question." (Appellant's Brief at 29.) It is undisputed that appellant was in prison at the time of the murders; thus, he did not acquire, carry, or use a firearm. Accordingly, the issue resolves to whether appellant knowingly "had" a firearm.

{¶ 64} This court discussed this issue in *State v. Ridley,* 10th Dist. No. 03AP-1204, 2005-Ohio-333:

> In order to "have" a firearm, one must either actually or constructively possess it. *State v. Hardy* (1978), 60 Ohio App. 2d 325, 327, 397 N.E.2d 773; *State v. Messer* (1995), 107 Ohio App. 3d 51, 56, 667 N.E.2d 1022. "Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Wolery* (1976), 46 Ohio St. 2d 316, 329, 348 N.E.2d 351 * * *. Constructive possession may also be achieved by means of an agent. *Hardy*, at 327; *U.S. v. Clemis* (C.A.6, 1993), 11 F.3d 597 * * * (constructive possession of a firearm exists when a defendant knowingly has the power and intention at any given time to exercise dominion and control over a firearm, either directly or through others). Moreover, we recognize that constructive possession of a weapon, even absent actual physical possession, may be established by a totality of evidence establishing an accomplice relationship between the physical possessor and his or her accomplice. *State v. McConnell* (Oct. 13, 1983), Cuyahoga App. No. 45294, 1983 Ohio App. LEXIS 13756.

*Id.* at ¶ 18.

{¶ 65} In *State v. Dalmida*, 1st Dist. No. C-140517, 2015-Ohio-4995, the court held that an accomplice can be convicted of having weapons under disability without holding the firearm if that accomplice aided and abetted the person who actually possessed and brandished the firearm. *Id.* at ¶ 16. "The accomplice can have constructive possession of the firearm by exercising dominion and control through another." *Id.* The court further held that a nonshooting accomplice can be convicted for having weapons under disability based on that accomplice's disability, not the disability of the shooter. *Id.* In other words, an accomplice can constructively possess a firearm by exercising dominion and control over another who does possess the firearm. *Id.*

{¶ 66} Recently, the Sixth District Court of Appeals affirmed a defendant's conviction for having weapons under disability in violation of R.C. 2923.13(A)(2), finding that while he was in prison, he constructively possessed a weapon found in his girlfriend's home. *State v. Brooks*, 6th Dist. No. WD-19-077, 2020-Ohio-6648. During prison calls with his girlfriend, Brooks directed her to put his firearm in the safe he kept in her house. A few days later, the police executed a search warrant at the girlfriend's residence and found the firearm. At trial, Brooks stipulated that he was under a qualifying disability and was prohibited from possessing a firearm.

{¶ 67} Due to the stipulation, the court found the only relevant question was whether Brooks "had" the firearm while he was in prison and the firearm was with his girlfriend. *Id.* at ¶ 11. The court concluded that "[a]lthough the gun was not within [Brooks] immediate physical possession as of April 13, 2018 [when it was discovered pursuant to the search warrant], a reasonable fact finder could conclude that [Brooks] exercised dominion and control over the gun as of that date so as to regain actual possession of the gun upon his release from jail, and therefore possessed the gun beyond a reasonable doubt." *Id.* at ¶ 14.

{¶ 68} As we explained above, appellant's convictions for felony murder were not against the manifest weight of the evidence because the evidence established that appellant aided and abetted those who actually possessed and fired the weapon. Although appellant was in prison and it was his associates who actually used a firearm to commit the murders, the phone calls initiated by appellant establish that appellant

directed those associates to take firearms with them to 85 Stevens. Even absent appellant's physical possession of the firearm and physical presence at the crime scene, appellant constructively possessed the firearm through those that physically possessed it. In other words, appellant constructively possessed a firearm by exercising dominion and control over those who did possess the firearm. *Ridley*; *Dalmida*; *Brooks*.

{¶ 69} Moreover, we note that the jury, in rendering its guilty verdicts on the felony murder counts, approved the accompanying firearm specifications, finding that appellant "act[ed] with another who had a firearm on or about his person or under his control while committing the offense and did display and/or brandish and/or indicate that he did possess the firearm and/or used the firearm to facilitate the offense." (Tr. at 1828.) "[T]he Ohio Supreme Court has held that [an accused] is subject to a sentencing enhancement on a firearm specification regardless of whether he was the principal or an unarmed accomplice." *State v. Humphries*, 8th Dist. No. 99924, 2014-Ohio-1230, ¶ 18, citing *State v. Chapman*, 21 Ohio St.3d 41, 42 (1986). "In such a case, the actions of the principal are imputed to the accomplice, and the accomplice may be found to have committed every element of the offense committed by the principal, including possession of the weapon." *Id.*, citing *State v. Frost*, 164 Ohio App.3d 61, 67, 2005-Ohio-5510 (2d Dist). Thus, the jury's finding that the principals "had" a firearm on or about their persons or under their control while committing the offenses may be imputed to appellant for purposes of the sentencing enhancement on the firearm specification and is consistent with the trial court's finding of guilt on having weapons under disability based upon "the possession of a firearm by other principal offenders." (Tr. at 1874.)

{¶ 70} For the foregoing reasons, we conclude that there was competent, credible evidence supporting the trial court's finding of guilt for having weapons while under disability, and his conviction for that offense was not against the manifest weight of the evidence.

{¶ 71} Our determination that appellant's convictions were not against the manifest weight of the evidence is dispositive of appellant's claim that his convictions were not supported by sufficient evidence. *Braxton*, 10th Dist. No. 04AP-725, 2005-Ohio-2198, ¶ 15. Accordingly, appellant's first and second assignments of error are overruled.

{¶ 72} Having overruled appellant's first and second assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and BEATTY BLUNT, JJ., concur.

_____