[Cite as *State v. Long*, 2021-Ohio-2656.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                          :

    Plaintiff-Appellee,              :

                               No. 20AP-90
v.                                      :                  (C.P.C. No. 15CR-3564)

Michael A. Long,                        :                  (REGULAR CALENDAR)

    Defendant-Appellant.             :

---

D E C I S I O N

Rendered on August 3, 2021

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Campbell Law, LLC,* and *April F. Campbell*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Michael A. Long, appeals from the February 7, 2020 judgment entry of conviction and sentence entered by the Franklin County Court of Common Pleas. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} Early in the morning of July 17, 2015, members of the Bowles family returned to their home on Scales Drive, located in Franklin County, Ohio, from working the night shift. Jill Mathias-Bowles, her husband Timothy Bowles ("Tim") and their two sons Shawn and Allen worked the night shift together. Jill, Tim, Shawn, and Allen drove to their shift together; however, at the end of the shift on this night, Allen went home with his girlfriend.

{¶ 3} Jill expected her oldest son, Timothy ("Timmy"), to be visiting that evening when they arrived home from work. Also expected in the home was Cindy Booth, now Bowles, who was Shawn's girlfriend at the time and also lived in the home. Elaine Hearld, who shared one minor child with Timmy at the time, would also periodically stay overnight in the living room of the Bowles' home with her then three children. Elaine was present in the Bowles' home on the night of July 16, 2015, along with her three children, sleeping on the living room floor. No one else was expected to be in the home that evening and, further, Elaine and Cindy did not have the Bowles' permission to invite anyone into the home.

{¶ 4} Upon arriving home, Jill was the first to enter the home. Jill noticed that a blanket had been moved to the bottom of the basement steps. Jill went down to the basement and into the laundry room where she encountered her son, Timmy, laying face down in a pool of blood, tied from his neck to his feet with an extension cord. Jill observed that Timmy had been beaten and was unconscious. Clement Cooper ("Poncho") then appeared pointing a gun at Jill. Next, appellant appeared from Allen's bedroom in the basement with guns strapped to his back and placed his hands over Jill's mouth. Jill pulled appellant's hands down and screamed for Tim and Shawn. Appellant then pushed Jill to the ground and stomped on her chest.

{¶ 5} Appellant went to go up the basement steps, but Jill pulled him back down as Shawn approached the top of the basement steps. When Shawn reached the top of the steps, he observed two men coming up the steps; the first pointing a gun up the steps and the second with guns strapped to his back. The first male was later identified as Poncho and the second male as appellant. Shawn and Poncho began to fight over the gun in Poncho's hand while Shawn used his body to push himself and the two men down the stairs. The guns carried by Poncho and appellant scattered over the basement floor.

{¶ 6} Tim went into the basement after Shawn and a physical altercation ensued. Tim testified appellant had a .357 Magnum in his hand pointed downward and the two struggled over the firearm; during the struggle, the firearm was moved sideways and was fired with appellant's finger on the trigger. Appellant then struck Tim.

{¶ 7} Once up from the floor, Jill went into the laundry room where Timmy lay unconscious and face down in a pool of blood. Jill woke Timmy and loosened the restraint to free his hands. Hearing the men continue to fight, Jill screamed for Elaine and Cindy to

call police. After hearing Jill scream, Elaine and her three children went into Cindy's room and Elaine called police. Jill then went upstairs, grabbed a baseball bat and came back down to the basement where Tim and appellant were still struggling over the firearm in appellant's hands. Jill used the baseball bat to hit appellant. Appellant threatened Jill and eventually shot her, causing injury and birdshot to be released into her body. Tim and appellant continued to struggle over the firearm, which discharged a third time toward the ceiling. Tim testified that he and appellant continued to fight, struggling over the firearm in both of their hands; however, eventually appellant got up and started to retreat.

{¶ 8} At the same time Tim and appellant were fighting, Shawn and Poncho fought over the firearm in Poncho's hand. During the fight, Shawn was able to grab the firearm from Poncho and the firearm slid across the floor. Shawn testified Poncho then attempted to leave the house so he placed Poncho in a "rear naked choke" to hold him. (Dec. 17, 2019 Tr. Vol. III at 449.) Shawn testified a "rear naked choke" is used to subdue people in order to stop fighting, which he used on Poncho because Poncho was the larger male in the struggle. Shawn further explained he held Poncho from behind, with his chest pressed against Poncho's back, and his left arm around Poncho's neck, holding Poncho in the "crouch" [sic] of his arm. (Dec. 17, 2019 Tr. Vol. III at 450.)[1] As Shawn held Poncho, Poncho removed a screwdriver from his pocket and began to stab Shawn about his head and neck with the screwdriver. Shawn testified he was stabbed 17 times in his head and once in his neck causing numerous wounds. Shawn believed Timmy took the screwdriver from Poncho; however, Tim testified he heard Shawn yell from Allen's bedroom that he was being stabbed and went to help Shawn. As Tim went to help Shawn, he heard appellant click the trigger of a firearm; however, the gun failed to fire. Tim came upon Shawn and Poncho and kicked the screwdriver from Poncho's hand as Poncho was about to stab Shawn again. Once Tim helped Shawn, he stopped appellant from leaving the basement.

{¶ 9} Shawn testified he was able to hold Poncho in the "rear naked choke" until law enforcement arrived. Shawn did not know how long he held Poncho. Once law enforcement arrived, Shawn testified he released Poncho and went upstairs. Jill described

---

[1] Tim provided the following testimony regarding his understanding of a "rear naked choke." Tim testified that Shawn locked Poncho into a "rear naked choke," explaining the mechanics of the hold as "your one arm goes around the neck and the other arm locks in the elbow and locks behind the head." Tim described a "rear naked choke" as a lethal chokehold. (Oct. 29, 2019 Tr. Vol. I at 136.)

the scene as a fight for their lives.  When police arrived, they found Poncho dead from asphyxia.

{¶ 10}  Timmy testified he was knocked unconscious by the blows from Poncho and appellant and that his first recollection was being wheeled out of the house in a wheelchair by either police or paramedics.  Timmy testified he awoke disoriented and drifted in and out of consciousness.  Timmy further testified to a number of injuries from the incident including swelling in his head and his left eye, a cut and scrape on his ear, and two puncture wounds on his leg with scratches and scrapes.  Timmy later discovered the $42 or $43 he had on him when he went to the house that evening was gone.

{¶ 11}  Dr. Donald Pojman, who is employed with the Franklin County Coroner's Office, provided testimony regarding an autopsy he performed July 17, 2015 on Poncho. Dr. Pojman testified the cause of Poncho's death was asphyxia, which he defined as a lack of oxygen getting to the brain which occurs from the closing off of blood flow to the head. Dr. Pojman testified to a number of injuries he observed during Poncho's autopsy indicating the cause of Poncho's death to be asphyxiation.  The first injury Dr. Pojman identified was bruising to the inside of Poncho's mouth on mucosal surfaces, indicating strikes to the face.  Dr. Pojman observed Poncho to have lack of loose teeth, which suggests something was pressed up against Poncho's mouth, obstructing the breathing process, rather than Poncho being struck about the mouth.  Dr. Pojman testified Poncho had a lot of hemorrhage in his right eye and small pinpoint hemorrhages in his left eye.  Dr. Pojman also observed injury and trauma to Poncho's neck, including fracture to the cartilage, which Dr. Pojman opined was indicative of a squeezing motion, in consideration of petechia he observed in the left-hand side of Poncho's left eye.  Dr. Pojman further testified regarding the trauma to Poncho's neck indicating there was compression against the larynx, which would stop the blood flow from getting in and out of the head leading to an asphyxia type death.

{¶ 12}  Dr. Pojman testified the injury patterns he described did not alone lead to a determination of Poncho's cause of death so, therefore, he considered other explanations for the cause of death.  However, he found Poncho to be a healthy man, with no drugs on board or other reason that could explain his death.  Dr. Pojman further testified the trauma to Poncho's neck and mouth would fit with asphyxiation; Poncho's ultimate cause of death.

{¶ 13} Plaintiff-appellee, State of Ohio, reasoned appellant and Poncho were in the Bowles' home on July 16 into 17, 2015, to steal guns from Allen's collection that he kept in his room located in the basement. Testimony at trial reflects Allen is a collector of guns, ammunition, knives, and sports memorabilia. Allen kept the collections in his room. Allen stored his rifles in two locked gun cabinets, but kept his pistols in a Craftsman toolbox. Allen testified the toolbox did not have a working lock in July 2015. Allen also testified that a number of guns were stored in cases beside and behind the gun cabinets and that a Mossberg shotgun hung from a metal rod running across the basement ceiling. According to Allen, he kept the keys to the gun cabinets on a key ring amongst other keys and at times the key ring was hidden, other times the keys were left in plain view. At trial, Allen identified the guns confiscated from the scene as his, except for a Ruger SP ("Ruger"). Allen testified the Ruger was not his and that police confiscated the gun and indicated to him the weapon was stolen. Allen also identified guns strewn over the basement floor as his and stated he did not leave his firearms in the manner as depicted in the state's exhibits. Allen testified that his .357 Smith & Wesson found at the scene had been loaded with three bullets, one of which contained birdshot. Pictures from the scene reflect a set of keys hanging from the lock of one of the gun cabinets and Allen testified he did not leave keys in the lock of his gun cabinet.

{¶ 14} The state entered into evidence, based on testimony from a patrol officer with the Columbus Division of Police ("CPD") and Columbus Crime Scene Search detective, a latex glove that Poncho had on his hand when they encountered him in the basement and the latex glove was similar to a second pair found at the scene. Additional evidence admitted at trial reflects CPD found Poncho's car at the gyro shop near the Bowles' home.

{¶ 15} On July 22, 2015, a Franklin County Grand Jury indicted appellant on the following charges alleged to have occurred on or about July 17, 2015: aggravated burglary in violation of R.C. 2911.11, a felony of the first degree; kidnapping as to Timmy in violation of R.C. 2905.01, a felony of the first degree; aggravated robbery as to Jill, Shawn, Tim, and Timmy in violation of R.C. 2911.01, a felony of the first degree; felonious assault as to Jill in violation of R.C. 2903.11, a felony of the second degree; felonious assault as to Shawn in violation of R.C. 2903.11, a felony of the second degree; murder as to Poncho in violation of R.C. 2903.02, an unclassified felony. Accompanying all of the above charges were three-

year firearm specifications pursuant to R.C. 2941.145(A). The indictment also charged appellant with attempted grand theft when the property is a firearm or dangerous ordinance in violation of R.C. 2923.02/ 2913.02, a felony of the fourth degree, accompanied by a one-year firearm specification pursuant to R.C. 2941.141(A), as well as having a weapon under disability, in violation of R.C. 2923.13, a felony of the third degree.

{¶ 16} Appellant proceeded to trial on August 1, 2016 and was found guilty of all charges pursuant to jury verdict and sentenced to 25 years to life. Appellant appealed the judgment entry filed September 12, 2016. This court rendered a decision reversing and remanding the matter for a new trial based on the trial court's violation of appellant's Sixth Amendment right to a public trial. *State v. Long*, 10th Dist. No. 16AP-708, 2017-Ohio-9322, ¶ 34.

{¶ 17} On remand, appellant voluntarily waived and relinquished his right to a trial by jury, electing the matter be heard by the trial judge. Trial commenced on October 29, 2019 and concluded January 16, 2020. The trial court rendered judgment on the record on the last day of trial finding appellant guilty of the offenses alleged in the indictment, with the exception of the firearm specification accompanying the murder charge. On February 7, 2020, appellant was sentenced to an aggregate prison sentence of 64 years to life.

{¶ 18} Appellant filed a timely notice of appeal.

## II. Assignments of Error

{¶ 19} Appellant assigns the following four assignments of error for our review:

> [I.] The trial court's error in admitting victim-impact testimony during the course of Long's trial was not harmless, requiring reversal of Long's convictions.
>
> [II.] The evidence for felony-murder was legally insufficient, because a reasonably unforeseeable intervening act caused the decedent's death, absolving Long of criminal liability for it.
>
> [III.] Because the evidence weighed manifestly against convicting Long, reversal of his felony murder conviction and the felonious assault against Shawn Bowles, is required.
>
> [IV.] Long's aggravated burglary, kidnapping, aggravated robbery, and attempted theft counts are subject to merger.

## III. Analysis

## A. First Assignment of Error

{¶ 20} In his first assignment of error, appellant asserts the trial court erred by allowing presentation of victim impact testimony by Jill during trial. Appellant further argues the admission of this testimony was not harmless and warrants reversal of his conviction. Appellant contends Jill's testimony was irrelevant and highly prejudicial and therefore should have been excluded under Evid.R. 401 and 403(A).

{¶ 21} In support, appellant argues: (1) there was no cause for Jill's testimony and it only served to enflame an instinct to punish, and (2) even though the case was tried to the bench and it was presumed a judge considers only relevant material and competent evidence, Jill's testimony was not harmless because the trial court's reference to Marsy's Law indicates the court considered the victim impact testimony when determining its findings regarding guilt.

{¶ 22} The state contends Jill's testimony was in part relevant testimony regarding the psychological impact and post-traumatic stress related to serious physical harm,[2] an element of aggravated robbery and felonious assault, and also the purpose to inflict serious physical harm as an element of kidnapping.[3] The state concedes, however, that other parts

---

[2] R.C. 2901.01(A)(5) provides: "Serious physical harm to persons" means any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
> (b) Any physical harm that carries a substantial risk of death;
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

[3] Relevant to the state's argument, the offenses of aggravated robbery, felonious assault, and kidnapping as defined by their Revised Code Sections are as follows:

Aggravated robbery, as defined by R.C. 2911.01, provides:
> (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
> (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
> (3) Inflict, or attempt to inflict, serious physical harm on another.

of Jill's testimony reflected personal views not related to guilt but, rather, related to sentencing. Notwithstanding the irrelevant nature of this part of Jill's testimony, the state argues that any error in admitting the same was harmless because of the presumption that a judge in a bench trial considers only relevant material and competent evidence, even when the judge overrules defense objections. The state also rejects appellant's concerns about the court's reference to Marsy's Law and argues the court's comments regarding the same indicate its knowledge that such testimony would not be relevant to the guilt determination but, rather, to the sentencing determination. Finally, the state provides context to some of Jill's testimony regarding appellant's mother and noted that the mother had been posting on social media insulting and threatening comments, making faces at the witnesses during trial, and exclaimed to the judge "[t]his is bullshit," and ultimately was excluded from the courtroom during the trial for misconduct. (State's Brief at 24-25, citing Dec. 17, 2019 Tr. Vol. III at 633.)

{¶ 23} Generally, "the admission of evidence lies within the broad discretion of the trial court and the reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. Appellant points us to the following portion of Jill's testimony:

> I didn't go into their home. I didn't go into his mother's home or his sister's or his aunt's, whatever. They came into my home. They violated my family.

---

Felonious assault, as defined by R.C. 2903.11, provides:
    (A) No person shall knowingly do either of the following:
    (1) Cause serious physical harm to another or to another's unborn;
    (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

Kidnapping, as defined by R.C. 2905.01 provides:
    (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
    * * *
    (2) To facilitate the commission of any felony or flight thereafter;
    (3) To terrorize, or to inflict serious physical harm on the victim or another[.]

They put my family through pure hell. We're still going through stuff. There's times that I can't even get out of bed because of being sick of this. There's times that - - Shawn, he can't hold a job and stuff - -

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Okay.

[JILL]: I'm going to say my part. They have got to say their part. It is my turn to say what they have did to my family.

We didn't go to his family's and did nothing. They have did this from July of 2015 to the present. And she's still to this day posting stuff that is putting my son's life in danger, my grandkids that he's with 24/7, putting their life in danger.

[DEFENSE COUNSEL]: Objection, Your Honor.

[JILL]: Putting my family in danger.

THE COURT: Okay.

[JILL]: Okay.

THE COURT: Just relax for a second.

[JILL]: We didn't put his family in danger.

THE COURT: Give me one second. Ma'am, one second.

I note your objection. I'm going to let her finish. There are concerns of mine for Marsy's Law and since it involves a phase.

You may finish what you were going to say, ma'am.

[JILL]: I mean, I've never - - one time I posted in all these years, one time. She posts this multiple things a day, talking stuff, calling my daughter-in-law retarded, calling her names, calling my son - - she's posting that - - calling my son Elmo. What the fuck does that mean?

They have done shit all these years that keeps my family in turmoil. Okay?

I can't take no more. Okay?

I can't do this no more. He needs to be punished to the fullest. He came into my home. He shot me. Poncho stabbed my youngest son with a screwdriver. Nobody knows what it feels like to be shot or stabbed with a screwdriver in the top of your head 17 motherfucking times straight down in the top of his head. Okay.

He is getting ready to be 24 years old and he still has to live at home, when him and his wife should have their own house and be able to live on their own and not fear because of him affiliated with some type of motorcycle gang.  Okay?

And then they want to post stuff that's endangering my family's life on a daily basis, but we should shut our mouths and not say nothing?

Because we didn't go into his home; he came into my home and violated us. After just being out of prison three months, he came into my home to steal my son's stuff that my son worked for every day since he was 18 years old. He is 25 now.

He has problems adjusting to this mother being shot with his own gun that he purchase hisself. That was my son's gun that I got shot with because of him. Okay?

My son - - the day I come out the hospital my son, mom - - was crying: Mom, I'm sorry. I'm sorry, mom.

Because it was his gun that shot me. Nobody knows what goes through my kids' head.

Timmy cannot hold a job hardly. It's hard for him because the beating in his head. It's caused traumatic brain injury to him and Shawn.

Me being shot, it causes me to have outbursts. And you can ask Brian and Cory. I can't take no more. It is so hard to hold it together for my family. I'm the one that has to be strong for my kids and my husband. All the trauma that they did to my family.

We don't even want to live in our home. We want to sell it and move away, but we can't financially afford it. Because when they came into our home, we had savings. We all had savings. My kids had savings.

> They had tons of money that we could have did whatever we wanted; but because of them of being off work and losing our full-time jobs and everything, we can't.

(Sic passim.)  (Dec. 17, 2019 Tr. Vol. III at 647-51.)

{¶ 24} " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid.R. 401.  "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."  Evid.R. 403(A).

{¶ 25} "This court has recognized that testimony as to the effect of a criminal act on the victim, the victim's family, or both, is usually not considered relevant evidence with regard to the guilt or innocence of the defendant.    Victim impact testimony creates a risk of inflaming the passions of the jury and resulting in a conviction on facts unrelated to the defendant's guilt or innocence."  *State v. Neil*, 10th Dist. No. 14AP-981, 2016-Ohio-4762, ¶ 78, citing *State v. F.R.*, 10th Dist. No. 14AP-440, 2015-Ohio-1914, ¶ 45.  However, this court has also held " '[e]vidence relating to the facts attendant to the offense is "clearly admissible" during the guilt phase, even though it might be characterized as victim-impact evidence.' "  *Neil* at ¶ 78, quoting *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 98, citing *State v. Fautenberry*, 72 Ohio St.3d 435, 440 (1995).

{¶ 26} Furthermore, as the state points out, " 'a judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record.' "  *State v. Powell*, 10th Dist. No. 14AP-1054, 2015-Ohio-4459, ¶ 20, quoting S*tate v. Johnson*, 5th Dist. No. 2014CA00189, 2015-Ohio-3113, ¶ 91, citing *State v. White*, 15 Ohio St.2d 146, 151 (1968).  *See also State v. Williams*, 6th Dist. No. L-11-1084, 2013-Ohio-726, ¶ 29-30, *appeal not allowed*, 135 Ohio St.3d 1461, 2013-Ohio-2285.  Indeed, Ohio court have held "[i]n contrast to juries, judges are presumed to know the law and expected to consider only relevant, material, and competent evidence during their deliberations." *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, ¶ 57, citing *State v. Post*, 32 Ohio St.3d 380, 384 (1987); compare *State v. Gillard*, 40 Ohio St.3d 226, 229 (1988).

{¶ 27} On the facts of this case, we agree with the state that the part of Jill's testimony pertaining to the physical and psychological effects of the incident on herself,

Tim, Timmy, Shawn, and Allen are relevant to the element of "serious physical harm." Jill testified to the experience of Timmy being beaten about his head, of her being shot, and the experience of Shawn from being stabbed in the head with a screwdriver, and the lasting impact on each person. Jill expressed on-going trauma experience, including inability to get out of bed or go about daily life without fear. We also agree with appellant that the testimony regarding what Jill believes would be a just punishment for appellant and the effects of appellant's mother posting about the Bowles family on social media was not relevant. However, we consider such admission was harmless because there was nothing to rebut the presumption that the trial court considered only relevant testimony in arriving at its determination of guilt and we are not persuaded by appellant's argument regarding the court's reference to Marsy's Law. We also note the trial court made no mention of the testimony in explaining its reasoning in finding appellant guilty. Furthermore, as outlined in the facts and discussed in the context of the third assignment of error, there exists overwhelming evidence to support the court's findings as to guilt.

{¶ 28} Therefore, we conclude the trial court did not abuse its discretion in admitting relevant testimony and any error in admitting non-relevant testimony did not prejudice appellant as it did not impact the fairness of the bench trial or the trial court's findings as to guilt.

{¶ 29} Accordingly, we overrule appellant's first assignment of error.

**B. Second Assignment of Error**

{¶ 30} In his second assignment of error, appellant asserts there was insufficient evidence to support his conviction for felony murder because an unforeseeable, intervening event caused the death of Poncho that absolves appellant's criminal liability.

{¶ 31} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " ' "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 24,

quoting *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 32}  "Under Ohio law, a defendant can be held criminally responsible for a killing 'regardless of the identity of * * * the person whose act directly caused the death, so long as the death is the "proximate result" of Defendant's conduct in committing the underlying felony offense.' " *State v. Rudasill*, 10th Dist. No. 19AP-61, 2021-Ohio-45, ¶ 77, quoting *State v. Dixon*, 2d Dist. No. 18582 (Feb. 8, 2002).  The Second District in *Dixon* explained:

> Under the "proximate cause theory," it is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the "proximate result" of Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience. [*Moore v. Wyrick*, 766 F.2d 1253 (8th Cir.1985); *State v. Chambers* 53 Ohio App.2d 266 (9th Dist.1977); *State v. Bumgardner*, [2d Dist. No. 97-CA-103 (Aug. 21, 1998)]; *State v. Lovelace*, [137 Ohio App.3d 206 (1st Dist.1999)].

{¶ 33}  Foreseeability should be assessed from the viewpoint of what the defendant knew or should have known in light of ordinary experience. *State v. Franklin*, 10th Dist. No. 06AP-1154, 2008-Ohio-462, ¶ 25, citing *State v. Lovelace*, 137 Ohio App.3d 206, 216 (1st Dist.1999).  Recently, in *State v. Agee*, 10th Dist. No. 19AP-12, 2021-Ohio-489, ¶ 43, this court discussed the issue of foreseeability in the context of considering a felony murder conviction under a theory of complicity.  We relied on two Eighth District cases, *State v. Hubbard*,[4] 8th Dist. No. 83389, 2004-Ohio-5204, ¶ 40, and *State v. Williams*,[5] 67 Ohio App.3d 677, 683 (8th Dist.1990), in reasoning that when a person, acting individually or in concert with another, sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known to him at the time, he is criminally liable for

---

[4] The *Hubbard* discussion involved a review of a conviction for complicity to felony murder.
[5] The *Williams* discussion involved a review of a conviction for involuntary manslaughter, a lesser-included offense of murder.

the direct, proximate and reasonably inevitable consequences of death resulting from his original criminal act. We quoted *Hubbard* in stating " '[i]t is not necessary that the accused be in a position to foresee the precise consequence of [his] conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by [his] conduct.' " *Agee* at ¶ 43, quoting *Hubbard* at ¶ 40, citing *State v. Losey*, 23 Ohio App.3d 93, 95-96 (10th Dist.1985).

{¶ 34} In support of his argument that there lacks legally sufficient evidence to support appellant's felony murder conviction, appellant acknowledges criminal responsibility under the proximate cause theory, however, asserts a reasonably unforeseeable intervening cause absolved appellant of criminal liability. *See State v. Dykas*, 185 Ohio App.3d 763, 2010-Ohio-359, ¶ 25 (8th Dist.), a discussion of involuntary manslaughter. In support of his argument, appellant identifies what he believes to be unforeseeable, intervening events absolving him of criminal liability: (1) it was not reasonably foreseeable that the family of the victims in this case would attack the suspects and keep them in the home, (2) in light of ordinary experience, it was a surprising and extraordinary consequence of appellant's actions that one of the individuals present would perform a "rear naked choke" maneuver on Poncho that appellant had no involvement with, and (3) appellant's involvement was complete by the time Shawn ended Poncho's life.

{¶ 35} According to the testimony, in the late or early hours of July 16 into July 17, 2015, appellant and Poncho entered the Bowles' home without invitation, while occupied by persons other than appellant and Poncho, with a Ruger firearm with the objective to steal the firearms of one of the occupants of the residence, Allen.

{¶ 36} "In committing an aggravated burglary and/or aggravated robbery armed with a weapon, and when the occupants of the residence are known to be present, it is a direct, natural, and reasonably foreseeable consequence that such actions would result in the death of another." *State v. Maynard*, 10th Dist. No. 11AP-697, 2012-Ohio-2946, ¶ 31, *see generally State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 51 (the felony murder statute contemplates a proximate cause theory, whereby the death was a reasonably foreseeable consequence of the two defendants' aggravated robbery offense, regardless of which of the two pulled the trigger). *See also State v. Weber*, 2d Dist. No. 22167, 2008-Ohio-4025, ¶ 22 (the defendant's involvement with an accomplice in an armed robbery

caused a chain of events in which one of the reasonably foreseeable consequences was the death of the accomplice; the defendant's involvement in the robbery was a proximate cause of the death of another).

{¶ 37} We are not persuaded by appellant's arguments in support of his sufficiency challenge that Poncho's death was not a foreseeable consequence of the events appellant and Poncho set into motion on July 16 into July 17, 2015. On the facts of this case, as appellant was committing aggravated burglary and/or aggravated robbery, armed with a weapon, with the objective to steal the firearms in the home, when the occupants were known to be present, it is a direct, natural, and reasonably foreseeable consequence that such actions would result in the death of another. *Maynard* at ¶ 31. Further, " '[t]he killing is committed in the perpetration or attempting to perpetrate one of the named felonies if it occurs at any time while the perpetrator is engaged in any acts immediately connected with such felony, even though the felony may have been already completed.' " *State v. Habig*, 106 Ohio St. 151, 163 (1922), quoting 1 McClain on Criminal Law, at 327. Here, appellant and Poncho physically engaged with members of the Bowles family on the stairs leading from the basement and in the basement in the commission of and after the commission of the aggravated robbery of Allen's firearms and felonious assault of Jill and Shawn.

{¶ 38} We recognize that many of the cases we have cited above involved death by means of a firearm. However, we are also not persuaded by appellant's argument that Shawn's use of a choke hold was an unforeseen intervening act. " 'We conceive few dangers, faced by the law-abiding public, to be more extreme than the unlawful entrance of one person into a residence occupied by another. The risk of actual serious physical harm to a victim or wrongdoer, the threat of surprise of one by the other, the natural inclination of the victim, if present, to protect and defend his abode and his family are all factors too clear to discuss further. To imagine that the risk of physical harm is not foreseeable under the circumstances surrounding this case defies not only logic but also the characteristics of the human animal.' " *Losey* at 95, quoting *State v. Chambers*, 53 Ohio App.2d 266, 270-71 (9th Dist.1977).

{¶ 39} We find unpersuasive appellant's sufficiency challenge that an unforeseeable, intervening event absolves appellant of criminal liability.

{¶ 40} Accordingly, we overrule appellant's second assignment of error.

**C. Third Assignment of Error**

{¶ 41} In his third assignment of error, appellant asserts that even if the state's evidence was legally sufficient, the evidence still weighed manifestly against appellant's convictions of felony murder and the felonious assault as to Shawn.

{¶ 42} An appellate court acts as a "thirteenth juror" when determining whether a verdict is against the manifest weight of the evidence. *Thompkins* at 387. "Under this standard of review, an appellate court weighs the evidence in order to determine whether the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Phillips*, 10th Dist. No. 14AP-79, 2014-Ohio-5162, ¶ 125, quoting *Thompkins* at 387. "However, in engaging in this weighing, an appellate court must bear in mind the factfinder's superior, first-hand perspective in judging the demeanor and credibility of witnesses." *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 43} As applicable here, Ohio law defines felony murder: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." R.C. 2903.02(B).

{¶ 44} Appellant first argues manifest weight of the evidence was not met with regard to the charge of felony murder because appellant was not involved in the fatal fight between Shawn and Poncho. As noted in our discussion of the second assignment of error, this court has held "[c]onsidering the proximate causation language used in R.C. 2903.02(B), and that the statute does not provide that the defendant or an accomplice must be the immediate cause of death, it is clear that Ohio has adopted the proximate cause theory. *See Dixon*. Therefore, under Ohio's felony-murder statute, it is irrelevant whether the killer is the defendant, an accomplice, or a third party." *State v. Ford*, 10th Dist. No. 07AP-803, 2008-Ohio-4373, ¶ 32. Appellant is criminally liable for felony murder so long as the death of Poncho was the proximate cause of appellant committing an underlying felony, here the underlying felony being aggravated burglary and/or aggravated robbery.

Because we found above Poncho's murder was a direct, natural and foreseeable consequence of appellant's commission of aggravated burglary and/or aggravated robbery, we do not find persuasive appellant's argument.

{¶ 45} Appellant next argues manifest weight of the evidence was not met with regard to the charge of felonious assault against Shawn and felony murder because appellant was actively trying to leave the scene prior to the incidents giving rise to the charges occurred.

{¶ 46} In the context of discussing the affirmative defense of abandonment to the offense of complicity, we have stated "in order to prove abandonment/termination, a defendant is required to show that he 'manifested a complete and voluntary renunciation of his criminal purpose.' " *Rudasill* at ¶ 53, quoting *State v. Hernandez-Martinez*, 12th Dist. No. CA2011-04-068, 2012-Ohio-3754, ¶ 40. In *Rudasill*, we stated "Under Ohio law, '[w]here one abandons an attempted crime because he fears detection or realizes that he cannot complete the crime, the "abandonment" is neither "complete" nor "voluntary." ' *State v. Chafin*, 5th Dist. No. 2019 CA 00014, 2019-Ohio-5306, ¶ 29, quoting *State v. Woods*, 48 Ohio St.2d 127, 133 (1976), *overruled on other grounds*, 51 Ohio St.2d 47. *See also State v. Green*, 4th Dist. No. 92 CA 32 (Dec. 14, 1993) (noting '[m]any [Ohio] courts have agreed that the act of ending a crime due to the fear of detection is not a "complete and voluntary renunciation" ')." *Id.* at ¶ 54. Although appellant asserts he was actively trying to leave prior to the assault of Shawn and murder of Poncho, appellant does not point to specific facts in the record supporting his argument. Nevertheless, assuming arguendo, that appellant's attempts to climb the stairs from the basement reflect appellant's attempt to terminate the criminal enterprise, we are not persuaded. Appellant's ascent of the stairs does not reflect a complete and voluntary renunciation of his criminal purpose because by the very nature of the crimes committed in this case, appellant leaving the Bowles' home is a given, as he would not remain in the home once the offense was complete. *Id.* at ¶ 53; *see Habig* at 161-62, citing *Conrad v. State*, 75 Ohio St. 52, 70 (1906). Furthermore, the facts reveal that before appellant attempted to run up the stairs while Shawn was struggling with Poncho: (1) appellant had attempted to climb the stairs with guns strapped to his back,

(2) he shot Jill, and (3) he attempted to shoot Tim.  Appellant was committing or attempting to commit the offenses of felonious assault, aggravated robbery, and aggravated burglary.[6]

{¶ 47} On the facts of this case, for the reasons stated above, based on the limited weighing of the evidence we are afforded in addressing manifest weight, we find the convictions are supported by the manifest weight of the evidence.

{¶ 48} Accordingly, we overrule appellant's third assignment of error.

## D. Fourth Assignment of Error

{¶ 49} In his fourth assignment of error, appellant asserts his convictions of aggravated burglary, kidnapping, aggravated robbery, and attempted grand theft are subject to merger.[7]

---

[6] In support of his abandonment/completion argument, appellant points to *State v. Roper*, 9th Dist. No. 7786 (Feb. 25, 1976), yet *Roper* and its predecessor cases do not assist appellant. *Roper* quoted *Conrad*, at 72, in holding " '[s]hort of the absolute completion or abandonment of the whole enterprise' a murder occurring after the commission of a robbery cannot be divorced from that robbery." The Supreme Court in *Conrad* rejected the appellant's argument that he was not guilty of murder as a result of his co-defendant's killing of a police officer while the two were fleeing the commission of burglary because the killing "was not the natural and probable consequence of the conspiracy to commit the burglary." *Id.* at 59-60. The *Conrad* court considered that the three purposes to burglary: (1) to break and enter, (2) with intent to steal, take, and carry away the property in the house, and (3) to escape from the place where the property was sought to be obtained. "These three acts of the defendants, together constitute the transaction which they had undertaken that night. Each of these acts represents a different stage of the process of the main transaction, and it is our contention that all things done within the process of any of these acts were done with the res gestae of the main transaction or in perpetration of the burglary. It will not do to say that the purpose to escape from the place where the property is sought to be obtained is merely incidental to the crime of burglary; that the purpose to escape is separate and independent of the purpose to break and enter and steal." *Conrad* at 62. Ultimately, the *Conrad* court held: "When two [persons], in furtherance of a common design, enter upon the perpetration of a burglary armed and prepared to kill if opposed, and while so engaged are discovered, and in the effort to escape one of the burglars kills one who is trying to arrest him, both burglars are equally guilty of the homicide, although one of them was not armed with a deadly weapon, and although such killing was not part of the prearranged plan." *Id.* at paragraph three of the syllabus. Although *Conrad* involved a burglary, the court further opined on the offense of robbery: "Can it be said of robbery that having taken possession of the property of another from that other's person by force that the robbery is at an end? Is there not in the crime of robbery the element of asportation? Does not this crime contemplate the escape of the accused from the place where his crime is committed? If after having the property in his possession his flight or attempt to escape is interrupted by the owner of the property and the owner is killed, must it be said, as is contended in this case, that the homicide was not committed while perpetrating the crime of robbery? It seems to us that the interposition of such a technicality destroys every reason of the statute." *Id.* at 63. The Supreme Court applied *Conrad* in *Habig*, 106 Ohio St. 151, and again rejected the appellant's argument that he was not guilty of murder as a result of his co-defendant's killing of a police officer while the two were fleeing the commission of a robbery.

[7] Although appellant articulates in his fourth assignment of error the trial court erred in failing to merge his conviction for attempted grand theft, no argument is made in support of this position and, further, the record reflects the trial court merged appellant's conviction for attempted grand theft with the aggravated burglary conviction. Therefore, we decline to address the same.

### 1. Merger and Allied Offenses Generally

{¶ 50} R.C. 2941.25 provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 51} "When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 24. " 'To determine whether two offenses are allied offenses that merge into a single conviction, a court must evaluate three separate factors: the conduct, the animus, and the import.' " *State v. Flood*, 10th Dist. No. 18AP-206, 2019-Ohio-2524, ¶ 28, quoting *State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 42, citing *Ruff* at paragraph one of the syllabus. " 'If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation.' " *Flood* at ¶ 28, quoting *Ruff* at ¶ 25. Ultimately, if the harm resulting from each offense is separate and identifiable, the offenses are of dissimilar import and do not merge. *Id.*, citing *Harris* at ¶ 42, citing *Ruff* at ¶ 25.

---

The trial judge stated at sentencing: "Along that line, in looking at the case law, I think the theft of the gun merges into Counts 1 or 3 at their election. Okay? * * * Well Counts 1 and 3 are different in the fact that one is pre the event of the shooting - - or the shootings that occurred on the stairs and the other one is post. So I think they're different animusses. Theft of guns, though, I think merges into either the burglary or the robbery or both at the same time. So Count 7 will merge. Okay?" (Feb. 3, 2020 Tr. at 4-5.) The trial court further stated as to Count 7, "I think it merges with Count 1 since they had already acquired the weapons before the rest of it occurred." (Feb. 3, 2020 Tr. at 10.)

{¶ 52} In conducting an analysis of whether two offenses are allied offenses of similar import, the Supreme Court of Ohio directs an appellate court to look beyond the statutory elements and to consider the defendant's conduct. *Flood* at ¶ 29. " 'A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed?' " *Flood* at ¶ 29, quoting *Ruff* at ¶ 25.

## 2. Standard of Review

{¶ 53} When a trial court makes a determination as to whether offenses should merge under R.C. 2941.25, we review that decision under a de novo standard. *State v. Broomfield,* 10th Dist. No. 12AP-469, 2013-Ohio-1676, ¶ 10, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 28. " ' "Appellate courts apply the law to the facts of individual cases to make a legal determination as to whether R.C. 2941.25 allows multiple convictions. That facts are involved in the analysis does not make the issue a question of fact deserving of deference to a trial court." ' " *Flood* at ¶ 25, quoting *State v. S.S.*, 10th Dist. No. 13AP-1060, 2014-Ohio-5352, ¶ 28, quoting *Williams*, 2012-Ohio-5699, at ¶ 25.

{¶ 54} Because appellant failed to raise the issue of merger as to the kidnapping conviction, our review is limited to plain error. *State v. Saxton*, 10th Dist. No. 18AP-925, 2019-Ohio-5257, ¶ 35, citing *State v. Adams*, 10th Dist. No. 13AP-783, 2014-Ohio-1809, ¶ 6, citing *State v. Taylor*, 10th Dist. No. 10AP-939, 2011-Ohio-3162, ¶ 34. However, " '[p]lain error exists when a trial court was required to, but did not, merge a defendant's offenses because the defendant suffers prejudice by having more convictions than authorized by law.' " *Broomfield* at ¶ 10, quoting *State v. Sidibeh*, 10th Dist. No. 10AP-331, 2011-Ohio-712, ¶ 55.

{¶ 55} Therefore, we review appellant's argument that the kidnapping conviction should have merged with the aggravated burglary and aggravated robbery under a plain error standard. We review appellant's argument for merger of his aggravated burglary, aggravated robbery, and attempted grand theft convictions under a de novo standard.

## 3. Appellant's Arguments in the Trial Court Regarding Merger

{¶ 56} Appellant filed a sentencing memorandum in support of his position regarding sentencing and merger in the trial court. Appellant's sentencing memorandum

argued Counts 3, aggravated robbery, and 7, attempted grand theft when the property is a firearm or dangerous ordnance ("attempted grand theft"), are allied offenses of similar import and also that Counts 3, aggravated robbery, and 1, aggravated burglary, are allied offenses of similar import. Appellant's sentencing memorandum next argued:

> Counts two, four, five and six[8] are all offenses with completely different victims. Because of this, none of these counts are subject to merger. Additionally, these counts are all of dissimilar import and are unallied offenses in relation to Count One. Although all of the offenses occurred while the defendant was trespassing in the victims' home, the offenses were separate and apart from the underlying theft offense because it involved a completely different victim, [Allen][9] Bowles. [Allen] Bowles testified that he was not present during the kidnapping, felonious assaults or murder. However, he became a victim once the defendant attempted to steal his possessions. Since his victimization only occurs through the commission of the burglary and is separate from the other offenses, Count One should be considered separately from the other counts as an unallied offense.

(Sentencing Memo at 4.) At the sentencing hearing, counsel for appellant at first declined to make an oral argument, but did eventually present argument during the hearing that this incident was one continuous criminal act; however, several victims were involved therefore resulting in charges for which appellant would be sentenced on each. The trial court merged appellant's conviction of attempted grand theft, Count 7, with aggravated burglary, Count 1, and declined to merge the remaining convictions.

### 4. Merger of Aggravated Burglary, Kidnapping, Aggravated Robbery, and Attempted Grand Theft

{¶ 57} In support of his argument for merger, appellant argues under the facts of this case the offenses of aggravated burglary, kidnapping, and aggravated robbery share a singular purpose and the same intent and, therefore, are of the same occurrence and should merge. We note appellant's argument addresses only whether the offenses were committed separately and with separate animus or motivation, the second and third factors articulated

---

[8] According to the indictment filed July 22, 2015, Count 2 reflects an offense for kidnapping as to Timmy, Count 4 reflects an offense for felonious assault as to Jill, Count 5 reflects an offense for felonious assault as to Shawn, and Count 6 an offense for felonious murder as to Poncho.

[9] Appellant names Shawn Bowles at this point in his sentencing memorandum; however, considering the context, we understand appellant to mean "Allen Bowles."

by *Ruff*, and does not address the first factor, whether each offense caused separate, identifiable harm.  *Ruff* at ¶ 25.  As we discuss below, on this basis alone, we would not reverse the judgment of the trial court.

{¶ 58}  The statute defining aggravated burglary provides:

> No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1) The offender inflicts, or attempts or threatens to inflict physical harm on another; (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

R.C. 2911.11(A).  Here, the offense of aggravated burglary was complete when appellant and Poncho entered the Bowles' home through their side door with a Ruger firearm and a screwdriver, while Elaine, her children, and Cindy were in the home.  Based on the facts and circumstances of this case, there was no other purpose for appellant and Poncho to be in the Bowles' home than to steal Allen's firearms.  *See State v. Frazier*, 58 Ohio St.2d 253, 256 (1979).

{¶ 59}  The statute defining aggravated robbery provides: "No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."  R.C. 2911.01(A)(1).  According to the testimony presented at trial, separate and identifiable harm was committed by appellant and Poncho during the commission of the aggravated robbery.

{¶ 60}  Appellant pointed a .357 Magnum downward toward Tim as they fought on the basement floor; during the struggle the firearm in appellant's control discharged twice. Tim was struck by appellant.  During the incident with appellant, Tim suffered bitemarks to his right arm, left shoulder, and left nipple, some of which left scars, scratches, black and blue eyes, and a knot on his forehead.

{¶ 61}  Jill encountered appellant in the basement and appellant placed his hands over Jill's mouth, shoved her to the ground, and stomped on her chest.  Appellant later, during the on-going fights, threatened, and eventually did, shoot Jill with the .357 Magnum,

where the bullet grazed her face and entered her shoulder.  As a result, Jill has 50 pellets from the bullet in her body, some of which are visible or able to be felt under her skin, and also caused scarring on the left side of her face, in addition to cuts and bruises.

{¶ 62} Shawn first encountered Poncho ascending the basement steps, pointing a firearm up the steps and appellant behind him with guns strapped to his back.  While attempting to subdue Poncho, Shawn was stabbed by Poncho with a screwdriver about his head and neck.  As a result, Shawn suffered a long cut along his left side jugular, with a visible scar to this day, 17 stab wounds to the top of his head, his right ear was bitten off, and the bottom of his left ear was stabbed.

{¶ 63} The statute defining kidnapping provides: "No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * (2) To facilitate the commission of any felony or flight thereafter; (3) To terrorize, or to inflict serious physical harm on the victim or another." R.C. 2905.01(A).

{¶ 64} According to the testimony presented at trial, Poncho or appellant repeatedly struck Timmy about his head in the basement, causing Timmy to lose consciousness, then tied Timmy with an extension cord, leaving him face down in the basement on the laundry room floor.  Jill observed a pool of blood beneath Timmy when she discovered him in the laundry room.  Timmy testified he awoke disoriented and was in and out of consciousness; and suffered swelling in his head and in his left eye, his ear was cut and scraped, and he had two puncture wounds on his leg with scratches and scrapes.

{¶ 65} In consideration of our analysis above, appellant's conviction of aggravated burglary was complete on entrance into the Bowles' home and, therefore, appellant's conduct was separate from the serious physical harm inflicted during the aggravated robbery and the act of inflicting serious physical harm on Timmy and restraining him. Further, appellant's convictions of aggravated robbery and kidnapping would not merge because separate, identifiable harm resulted from each offense.  Therefore, appellant's convictions of aggravated burglary, kidnapping, and aggravated robbery are not subject to merger.

**5. Constitutional Argument**

{¶ 66} Appellant argues under the Double Jeopardy Clause, "no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb,' " citing the Fifth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. (Appellant's Brief at 21.) We note appellant's argument appears to equate the protections under the Double Jeopardy Clause with those related to merger under R.C. 2941.25. Appellant makes no other argument regarding application of the Double Jeopardy Clause to his fourth assignment of error, therefore, we decline to address the argument.

{¶ 67} Accordingly, we overrule appellant's fourth assignment of error.

**IV. Conclusion**

{¶ 68} Having overruled appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and LUPER SCHUSTER, JJ., concur.

_____